The CAROLINA CASUALTY INSURANCE COMPANY, a corporation of the State of Florida, and Charles Stanford

v.

The INSURANCE COMPANY OF NORTH AMERICA, a corporation of the Commonwealth of Pennsylvania, Refrigerated Transport Co., Inc., a corporation of the State of Georgia, and Courtland T. Babcock, II and Barbara Babcock.

Appeal of REFRIGERATED TRANSPORT CO., INC.

No. 78–1465.

United States Court of Appeals, Third Circuit.

Argued Dec. 11, 1978.

Decided March 5, 1979.

Howard M. Berg, and William J. Cattie, III, Berg, Aber, Heckler & Wyatt, P. A., Wilmington, Del., for appellant.

Robert G. Carey, Prickett, Ward, Burt & Sanders, Wilmington, Del., for appellees Carolina Casualty Insurance Co. and Charles Stanford.

H. Murray Sawyer, Jr., Wilmington, Del., for appellee Insurance Co. of North America.

Before GIBBONS, VAN DUSEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

The pattern of facts in this case is a common one. See, for example, *Insurance Co. of North America v. Continental Casualty Co.*, 575 F.2d 1070, 1071 (3d Cir. 1978); *Carolina Casualty Insurance Co. v. Underwriters Insurance Co.*, 569 F.2d 304, 306 (5th Cir. 1978); *Walter v. Dunlap*, 368 F.2d 118 (3d Cir. 1968). An ICC-certified motor carrier (here, Refrigerated Transport Co.) leases a truck; the lessor of the vehicle (here, Charles Stanford) also provides the driver (here, Hugh F. Wicker). The truck, while carrying goods on the lessee's business and displaying the lessee's ICC placards, is involved in an accident. Members of the public (here, the Babcocks), alleging injury

in the accident, sue lessee, lessor and driver for damages. The insurers of the defendants in that case, meanwhile, stand anxiously by, each trying to bow the other through the courtroom door first. The result is a separate declaratory judgment action in which the lessor's insurer (here, the Carolina Casualty Insurance Co.) and the lessee's insurer (here, The Insurance Company of North America) seeks a determination as to which has the unwanted honor of first entering to defend and pay a settlement or judgment in the underlying action against their insureds.

This is an appeal from such a declaratory judgment. The district court in this declaratory action granted summary judgment in favor of the lessor and his insurer, declaring that the defendants had primary responsibility for defending and paying any settlement or judgment in the underlying tort action, which was then pending in the District Court of Delaware. We affirm in part and reverse in part, holding that the lessor and his insurer also have duties of defense and payment, and we remand for further determinations of fact and law.

1. It should be noted that plaintiffs have failed to state in their complaint the principal place of business of defendant Refrigerated. Thus the jurisdictional allegations in the pleadings are inadequate to establish jurisdiction under 28 U.S.C. § 1332(c), which provides that "a corporation shall be deemed a citizen of any State by which it has been incorporated *and of the State where it has its principal place of business* . . ." (emphasis added). Upon remand, the district court should bring this inadequacy of pleading to the attention of counsel. Once it has ascertained from the parties in what state Refrigerated has its principal place of business, the court should allow amendment of the pleadings pursuant to 28 U.S.C. § 1653, unless the court finds that diversity is in fact lacking. *Cf. Transport Indemnity Co. v. Home Indemnity Co.*, 535 F.2d 232, 233 n.1 (3d Cir. 1976) (amendment permitted by court of appeals, where proof of diversity was available to that court).

2. Also named as defendants in the district court declaratory judgment action were Courtland T. Babcock, II and Barbara Babcock, who, as plaintiffs in the underlying tort action, were joined pursuant to F.R.Civ.P. 19.

3. The INA policy refers to Refrigerated's liability for the first $25,000. of loss as "Insured's

## I. FACTS AND HISTORY OF THE CASE

The Carolina Casualty Insurance Company ("Carolina") and Charles Stanford ("Stanford"), appellees in this appeal, brought the action in the district court, alleging jurisdiction under 28 U.S.C. § 1332 [1] and seeking a declaration that Carolina's "policy of liability insurance applies only as excess insurance over other valid and collectible insurance . . ." (5a). Carolina is the insurance carrier for Stanford. Stanford is the owner of a tractor-trailer rig which he leased to Refrigerated Transport Co. ("Refrigerated"), appellant in this appeal and defendant in the declaratory judgment action. Also a defendant in that action was The Insurance Company of North America ("INA").[2] Refrigerated held a special contract of automobile liability insurance with INA, under which Refrigerated was in effect a self-insurer for the first $25,000. of loss resulting from any one occurrence,[3] while INA's coverage extended to the amount of loss in excess of $25,000. up to a combined limit of $1,000,000.[4]

Retained Limit" (11a). Refrigerated emphasizes in its briefs that the retained limit is not a deductible but, rather, self-insurance, Reply Brief of Appellant at 7–8, and that its certificate of self-insurance has been approved by the ICC, Brief at 18. Refrigerated also warranted in its INA policy that it was a qualified self-insurer (18a), and that it had "engaged the services of Employers Self-Insurance Service Company . . ." (25a).

4. The policy with INA is denominated a "Truckman *Excess Liability* Policy" (11a, emphasis added). The policy sets out limits of liability as follows (11a):
"Limits of Liability:
 Insured's Retained Limit:
 Item 1. $25,000 as the result of any one occurrence, Personal Injury, Property Damage & Cargo

 INA's Limit:
 Item 2. $975,000 as the result of any one occurrence, Personal Injury, Property Damage & Cargo"
Elsewhere the policy states (14a):
 "RETAINED LIMIT—INA's Limit of Liability

" . . . INA's liability shall be only for the ultimate net loss in excess of the Insured's

After defendants had filed an answer and a counterclaim for a declaration that Carolina's coverage was primary and their own merely excess (40a–42a), plaintiffs and defendants moved for summary judgment (51a, 52a).

For the purpose of the cross-motions for summary judgment, the parties entered into the following stipulation of facts (53a–55a):

"On or about August 29, 1973, Refrigerated entered into a trip-lease contract with Charles Stanford by which Refrigerated paid a specified compensation for the use of Mr. Stanford's 1969 white [sic] tractor and 1971 utility van trailer, with driver, for the hauling of certain goods over Refrigerated's interstate commission's route to New York City, New York.[5] . . .

"On and prior to August 30, 1973, Refrigerated engaged in interstate trucking as a certificated carrier licensed by the Interstate Commerce Commission. Refrigerated's ICC permit No. is 107515. To protect itself against liability for certain motor vehicle accidents, Refrigerated, as required by ICC rules and regulations and federal law, entered into a contract of liability insurance with INA.[6] Under that policy the driver [Hugh F.] Wicker, was an 'additional insured' by virtue of plaintiff's 'omnibus clause'. INA certified its policy with refrigerated [sic] to the ICC as required by 49 U.S.C.A. § 315. . . .

"Stanford, the owner-lessor, was not in the business of transporting freight and merchandise, except exempt agricultural commodities, in Inter-State Commerce. Stanford is and was not licensed as a certificated carrier by the Inter-State Commerce Commission. At the time of the lease of his tractor-trailer to Refrigerated, Stanford had in effect a liability insurance policy with the Carolina Casualty.[7] . . .

"On August 30, 1973, the tractor-trailer, during the lease by Charles Stanford to Refrigerated, and while engaged in hauling goods and materials under the authority of Refrigerated's ICC permit and displaying the latter's ICC placards, collided with a 1973 BMW driven by Courtland T. Babcock, II, at the toll booths of the Delaware Memorial Bridge. Courtland T. Babcock, II, was the operator of the 1973 BMW; his [then-] wife, Barbara, was riding in the right front seat; their two children were riding as passengers in the rear seat. Courtland and Barbara Babcock brought suit in this Court for their alleged personal injuries. [The title of that action is *Babcock v. Wicker, Stanford & Refrigerated Transport Co.*, Civil No. 75–133 (D.Del., Nov. 30, 1978). During the course of trial, Barbara Babcock withdrew her claim for relief against all defendants.] . . .

"Both INA and Carolina Casualty contend that its [sic] respective policy of liability insurance applies only as excess insurance over the other company's valid and collectible insurance for the claims of the Babcocks. Both companies take the position that the other's policy is primary, valid and collectible insurance. In the alternative, both companies contend that each policy should apply to the claim of the Babcocks, with each insurance company being obliged to contribute to the satisfaction of any judgment obtained or settlement achieved in the same ratio as their respective limits bear to each other."

The district court entered summary judgment in favor of plaintiffs on February 13,

---

retained limit for an amount not exceeding the amount specified in the limits of liability section of the declarations as the result of any one occurrence."

**5.** The trip lease is reproduced in full in the appendix of appellant at 9a–9aa and pertinent provisions are described and reproduced at page 13 and in note 20 below.

**6.** Provisions of the INA policy most pertinent to this appeal are reproduced in note 4 above and notes 26, 47, 50 and 51 below; the policy is reproduced in full at 10a–39a.

**7.** Provisions of the Carolina policy most pertinent to this appeal are reproduced in notes 47, 48, 50 and 51 below; the policy is reproduced in full at 57a 79a.

1978, declaring that Refrigerated and INA, "to the extent of coverage and within the limits of liability contained in the insurance contract, are primarily responsible for defending" the Babcocks' underlying tort case, "and for paying any settlement or judgment recovered by the Babcocks in that suit" (80a–81a). The court's accompanying memorandum opinion (82a–89a) stated that these primary responsibilities fell to Refrigerated and its insurer, because, under federal motor carrier regulations, "liability for damages to the Babcocks is imputed to, and imposed by law on, Refrigerated . . ." (85a). The court held that a purported "hold harmless" agreement, executed by the driver on behalf of the lessor and in favor of the lessee, could not shift primary responsibility to Stanford and his insurer. In addition, the court declined to rule on other issues relating to possible common law rights to indemnity from Stanford and Carolina on the ground that "these issues would require advisory opinions . . . because the underlying Babcock case has not yet been resolved" (89a).

Refrigerated moved for reargument under Local Rule 16 (109a–110a); the district court denied this motion (114a–115a). Thereupon Refrigerated filed notice of this appeal (116a).[8] INA has not appealed from the declaratory judgment.

After the filing of briefs in this appeal, but before oral argument, the underlying *Babcock* case went to trial. The claims which were presented to the jury in that case included: (1) common law negligence of the driver Wicker; (2) vicarious liability of both Refrigerated and Stanford for the negligent acts of Wicker as employee of both Refrigerated and Stanford; (3) per se negligence of Wicker, Stanford and Refrigerated for failure to maintain operative brakes and inability to stop within a specified distance, as required by Department of Transportation regulations, 49 C.F.R. §§ 393.48[9] and 393.52;[10] (4) per se negligence of Refrigerated for failure to inspect or for negligent inspection of the tractor-trailer before commencement of the trip lease, in violation of 49 C.F.R. § 1057.4(c);[11] and (5) strict liability of Stanford, as the lessor of defective equipment.[12] In addi-

8. Subsequent motions to the district court and to this court requesting stays of the district court order were both denied (117a–119a; Brief of Appellees at 3).

9. 49 C.F.R. § 393.48 provides in pertinent part:
 *"Brakes to be Operative.*
 "All brakes with which motor vehicles are equipped shall be operative at all times . . . ."

10. 49 C.F.R. § 393.52 provides in pertinent part:
 *"Brake performance.*
 "(a) Upon application of its service brakes, a motor vehicle or combination of motor vehicles must under any condition of loading in which it is found on a public highway, be capable of

 . . . . .

 "(3) Stopping from 20 miles per hour in a distance, measured from the point at which movement of the service brake pedal or control begins, that is not greater than [40 feet]."

11. 49 C.F.R. § 1057.4(c) provides in pertinent part:
 *"Safety inspection of equipment by the authorized carrier.* It shall be the duty of the authorized carrier, before taking possession of equipment, to inspect the same or to have the same inspected by a person who is competent and qualified to make such inspection and has been duly authorized by such carrier

to make such inspection as a representative of the carrier in order to insure that the said equipment complies with the Motor Carrier Safety Regulations of the Federal Highway Administration of the Department of Transportation. . . . The person making the inspection shall certify the results thereof on a report . . . and if his inspection discloses that the equipment does not comply with the requirements of the said safety regulations, possession thereof shall not be taken. When such an inspection has been made, the authorized carrier or an officer or partner thereof, or a safety director or other supervisory employee responsible for safety compliance, shall certify on the inspection report that the person who made the inspection, whether an employee or person other than an employee, is competent and qualified to make such inspection and has been duly authorized to do so by such carrier as its representative."

12. The Restatement (Second) of Torts § 402A (1965) provides in part that "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm thereby caused to the ultimate user or consumer . . .." The Delaware Supreme Court appears to recognize a twofold extension of § 402A, permitting (1) actions against *lessors* as well as sellers of

tion, Refrigerated and Stanford had each filed cross-claims against the other for contribution and indemnification in the event that Babcock's claims should prove successful.[13]

The findings of fact in *Babcock* were made by the jury's answers to a series of special interrogatories and a subsequent questionnaire, which the trial court submitted to the jury after the charge. This court granted the motion of the parties to supplement the record on appeal with copies of the special interrogatories and subsequent questionnaire and the jury's answers thereto. In the answers to the special interrogatories the jury awarded damages of $34,000. to Courtland Babcock. It allocated 20% of the fault for the accident to Stanford, lessor of the tractor-trailer, and 80% to the lessee, Refrigerated, while finding no fault on the part of the driver, Wicker. In its answers to the subsequent questionnaire, the jury found: (1) that it had not been adequately proved that the tractor-trailer involved had at the time of leasing a defective braking system which proximately caused the accident and injuries; (2) that Refrigerated, the lessee of the rig, had failed to perform, or negligently performed, its non-delegable duty to inspect the tractor-trailer as required by 49 C.F.R. § 1057.-4(c), and that this failure or negligence proximately caused the accident and injuries; (3) that Refrigerated, but not Stanford, was independently negligent in violating 49 C.F.R. § 393.48 by not having operative brakes on the rig, which failure or negligence proximately caused the accident and injuries; (4) that both Refrigerated and Stanford were independently negligent in violating 49 C.F.R. § 393.52 by reason of the fact that the rig was incapable of being

stopped in time to avoid the collision, and that this failure or negligence was a proximate cause of the accident and injuries; and (5) that there was no valid hold-harmless agreement entitling Refrigerated to indemnity from Stanford. The special interrogatories (Exhibit A) and subsequent questionnaire (Exhibit B) are annexed to this opinion.

On November 30, 1978, the trial court in *Babcock* entered judgment on the jury's verdict, providing in part:

> "It is Ordered and Adjudged that the judgment be entered in favor of the plaintiff Courtland T. Babcock, II, and against defendant Charles Stanford and defendant Refrigerated Transport Co., Inc., *jointly and severally* in the amount of $34,000 with the primary responsibility for paying said judgment being that of Refrigerated Transport Co., Inc., and allocation of fault for contribution being as follows: defendant Charles Stanford—20%; defendant Refrigerated Transport Co., Inc.—80%.
>
> "It Is Further Ordered and Adjudged that the judgment be entered in favor of the defendant Hugh F. Wicker and against plaintiff Courtland T. Babcock, II."

(Emphasis added.)

## II. ISSUES ON APPEAL

The handing down of a verdict and entry of judgment in the underlying tort case have narrowed the issues which were originally before this court on appeal of the declaratory judgment.

Refrigerated in its briefs on this appeal contended (1) that the question of duty to

---

products, and (2) actions by injured third parties as well as by users or consumers of products. *See Martin v. Ryder Truck Rental, Inc.,* 353 A.2d 581 (Del.1976). *See generally* Henszey, *Application of Strict Liability to the Leasing Industry,* 33 Bus.L. 631 (1978). *But see Windle v. Clark Equipment Co.,* 373 A.2d 571 (Del. 1977) ("[w]hether § 402A and all of its elements are appropriate for Delaware has been deliberately left open . . . .

13. In particular, Refrigerated claimed that Stanford had executed a hold harmless agreement, to indemnify or reimburse Refrigerated for any amounts the latter was required to pay to Babcock. The trial court in *Babcock* instructed the jury to find as a matter of fact whether the purported agreement was validly executed. It also charged the jury to apportion relative degrees of fault, if any, among the defendants, pursuant to Delaware's Uniform Contribution Among Joint Tort-Feasors Law Del.Code tit. 10 §§ 6301–6308.

pay any judgment recovered in the *Babcock* case was not justiciable; (2) that the district court erred in imposing the primary duty to defend upon Refrigerated; and (3) that even if the issue of duty to pay was justiciable, the district court's order was ambiguous and overly broad in imposing on Refrigerated the primary duty to defend and to pay as to all causes of action asserted in *Babcock*.[14]

Refrigerated now concedes that the jury verdict in *Babcock* has mooted certain of its contentions. First, it concedes that there is no longer any question about the justiciability of the duty to pay issue.[15] Motion of the Parties to Supplement the Record at 2. Further, it is conceded that the jury's findings of fact narrowed the controversy relating to Refrigerated's duty to pay by rendering moot that issue as affected by Stanford's potential liability for (a) *respondeat superior,* and (b) strict liability.[16] *Id.* Finally, Refrigerated concedes that this court need no longer consider the effect of the district court's declaratory judgment order upon its right to indemnification.[17] *Id.*

The questions which remain in this appeal are the following:

(1) Does the district court's declaratory judgment order erroneously destroy Refrigerated's rights to contribution from Stanford or his insurer for payment of the *Babcock* judgment?

(2) Does Refrigerated have the "primary" duty to pay the judgment entered in favor of Babcock and against Refrigerated and Stanford?

(3) Does Refrigerated have the "primary" duty to defend the *Babcock* case on behalf of Stanford and Wicker?

We conclude (1) that nothing in the federal motor carrier laws or in the private agreements in this record affects Refrigerated's contribution rights; (2) that those laws do not impose upon Refrigerated, nor absolve Carolina of, the duty to pay judgments entered against Stanford, Carolina's named insured; and (3) that nothing in the federal requirements places on Refrigerated, nor frees Carolina of, a duty to defend on behalf of Stanford and Wicker.[18]

## III. SOURCES OF DUTIES TO PAY AND TO DEFEND

The threads comprising the knot of disputed duties in this case originate in three sources: (1) federal law, including the statutes and regulations governing use of non-owned vehicles by motor carriers; (2) state law, including the body of common and statutory law governing duties of care to

---

**14.** Specifically, Refrigerated argued that under the language of the order, no burden for any judgment recovered by Babcock would be likely to fall on Stanford, Wicker or Carolina, thus shielding those parties from liability that could otherwise be imposed on them under applicable state law. Refrigerated argued further that the use of the word "primary" in the order could be interpreted to destroy Refrigerated's possible rights to indemnification and contribution against Stanford or Wicker by, in effect, declaring that Refrigerated was a primary insurer for those parties while Carolina was an excess insurer.

**15.** In *Nationwide Mut. Ins. Co. v. Fidelity & Cas. Co. of N. Y.,* 286 F.2d 91, (3d Cir. 1961), this court declined to rule on a question of primary duty to pay because "[t]he number of possible verdicts which could be reached in the pending suit . . . is huge. . . . To attempt to sift out all the potential verdicts and place the liability of the insurers in each event is not only beyond our powers it would be a fruitless task." 286 F.2d at 92 n.6; *see Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241, 57

S.Ct. 461, 81 L.Ed. 617 (1937). In the present posture of this appeal, the *Nationwide* problem has disappeared: many "potential verdicts" have given way to one actual verdict. *Cf. Allstate Ins. Co. v. Liberty Mut. Ins. Co.,* 368 F.2d 121, 122 n.1 (3d Cir. 1966) (settlement of underlying tort action by date of trial). *See generally Transport Indem. Co. v. Home Indem. Co.,* 535 F.2d 232, 234 n.2 (3d Cir. 1976).

**16.** The jury found the driver non-negligent, eliminating the possibility that Stanford should be held vicariously liable for the driver's negligence. The jury also found that it had not been proven that the involved vehicle had a defect at the time Stanford leased it to the lessee (Refrigerated), thus making § 402A inapplicable.

**17.** The jury found that there was not a valid hold-harmless agreement entitling Refrigerated to indemnity or reimbursement from Stanford.

**18.** Our conclusions are summarized in more detail in part IV of this opinion.

third parties and duties and rights between master and servant, between insurer and insured, between co-insurers, and between joint tortfeasors; and (3) private contracts (as governed by applicable law), including the trip lease agreement between Stanford (the lessor) and Refrigerated (the lessee), Stanford's insurance contract with Carolina, and Refrigerated's contract with INA.

### 1. *The role of federal law*

The federal regulations applicable to the use of leased motor vehicles by motor carriers have their statutory source in § 204(e) of the Interstate Commerce Act, 49 U.S.C. § 304(e) (1977), which authorizes the Interstate Commerce Commission (ICC) to prescribe regulations "with respect to the use by motor carriers (under leases, contracts, or other arrangements) of motor vehicles not owned by them, in the furnishing of transportation of property . . . ." The Act also authorizes the ICC to make regulations assuring that lessees of motor vehicles have full direction and control of, and full responsibility for such vehicles, "as if they were the owners of such vehicles." *Id.,* subsection (2).

Pursuant to this statutory mandate, the ICC regulation governing vehicle leases requires that the lessee undertake in the lease "exclusive possession, control and use of the equipment," and assume complete "responsibility in respect thereto." 49 C.F.R. § 1057.4 (1977).[19] In compliance with this regulation, Refrigerated, as lessee, agreed to assume "all liability to . . . the public, and responsibility to the [ICC] . ." in paragraph 3 of the trip lease in this case.[20]

The lease also provides that Refrigerated, the lessee, certifies that its authorized representative has inspected the leased equipment (8a). This certification is required by 49 C.F.R. § 1057.4.[21]

In addition, as a condition of obtaining and retaining an ICC permit, a motor carrier such as Refrigerated, whether renting or owning its vehicles, must comply with § 215 of the Interstate Commerce Act, 49 U.S.C. § 315 (1977),[22] to provide "security for the protection of the public." That provision, through the ICC regulations implementing its mandate,[23] requires ICC permit appli-

---

**19.** 49 C.F.R. § 1057.4 provides in pertinent part:

"(a) *Contract requirements.* The contract, lease, or other arrangement for the use of such equipment:

. . . . .

"(4) *Exclusive possession and responsibilities.* Shall provide for the exclusive possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the lessee for the duration of said contract, lease or other arrangement. . . ."

**20.** Paragraph 3, though partially illegible in the record, may be assumed to read as follows (9aa):

"Lessee [Refrigerated] shall have dominion, supervision and control of the equipment during said trip, and assumes all liability to the shipper, the consignee, and the public, and responsibility to the interstate commerce commission for compliance with its rules and regulations."

Similar clauses are a standard feature of vehicle leases. *See, e. g., Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.,* 423 U.S. 28, 31, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975); *Carolina Cas. Ins. Co. v. Underwriters Ins. Co.,* 569 F.2d 304, 307 n.7 (5th Cir. 1978).

**21.** See note 11 above.

**22.** 49 U.S.C. § 315 reads in part:

"Security for protection of public

"No certificate or permit shall be issued to a motor carrier or remain in force, unless such carrier complies with such reasonable rules and regulations as the Commission shall prescribe governing the filing and approval of surety bonds, policies of insurance, qualifications as a self-insurer or other securities or agreements, in such reasonable amount as the Commission may require, *conditioned to pay,* within the amount of such surety bonds, policies of insurance, qualifications as a self-insurer or other securities or agreements, *any final judgment recovered against such motor carrier for bodily injuries* to . . . any person resulting from the negligent operation, maintenance, or use of motor vehicles under such certificate or permit, or for loss or damage to property of others."

(Emphasis added.)

**23.** 49 C.F.R. § 1043.1(a) (1977), which substantially tracks the language of the statute, provides:

"*Property damage; public liability.*

"[N]o common or contract carrier . . . shall engage in interstate or foreign com-

cants to file "surety bonds, policies of insurance, qualifications as a self-insurer, or other securities or agreements . . ." with the ICC. Such assurances of the motor carrier's financial responsibility are to be conditioned to pay, within the limits of coverage, "any final judgment recovered against such motor carrier for [personal injury or property damage] resulting from the negligent operation, maintenance or use" of vehicles operating under the carrier's ICC permit.

Pursuant to these regulations, Refrigerated registered with the ICC as a self-insurer,[24] and INA, its insurer, certified its policy to the ICC. ICC rules also prescribe a uniform "Endorsement for Motor Carrier Policies" ("ICC endorsement").[25] The endorsement provides that neither other contractual limitations nor violations of the insurance agreement by the insured "shall relieve the [insurance] company from liability hereunder or from the payment of any such final judgment [against the motor carrier-insured], irrespective of the financial responsibility or lack thereof . . . of the insured;" however, the insurer may subsequently proceed against its insured for any payments which the insurer makes under the endorsement, but which it would not otherwise have been required to make. Although the ICC endorsement does not appear in the record in this case, other language in the policy[26] may be read as

---

merce, and no certificate or permit shall be issued to such a carrier or remain in force unless and until there shall have been filed with and accepted by the Commission a surety bond, certificate of insurance, proof of qualifications as a self-insurer, or other securities or agreements, . . . *conditioned to pay any final judgment recovered against such motor carrier* for bodily injuries to or the death of any person resulting from the negligent operation, maintenance or use of motor vehicles . . . ." (Emphasis added.)

*Id.* § 1043.2 prescribes minimum amounts of coverage.

*Id.* § 1043.5 provides that the ICC ". . . will approve the application of a motor carrier to qualify as a self-insurer if such carrier furnishes a true and accurate statement of its financial condition and other evidence which will establish to the satisfaction of the Commission the *ability of such motor carrier to satisfy its obligations for bodily injury liability,* property damage liability, or cargo liability without affecting the stability or permanency of the business of such motor carrier." (Emphasis added.)

*Id.* § 1043.7(a) provides:
"Endorsements for policies of insurance, and surety bonds, certificates of insurance, applications to qualify as a self-insurer, or for approval of other securities or agreements, and notices of cancellation must be in the form prescribed and approved by the Commission. Surety bonds and certificates of insurance shall specify that coverage thereunder will remain in effect continuously until terminated . . . ."

**24.** See note 3 above.

**25.** That endorsement, ICC Form BMC 90, reads in part:

"Within the limits of liability hereinafter provided it is further understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, or any other endorsement thereon or violation thereof, or of this endorsement, by the insured, shall relieve the Company from liability hereunder or from the payment of any such final judgment, irrespective of the financial responsibility or lack thereof or insolvency or bankruptcy of the insured. *However, all terms, conditions, and limitations in the policy* to which this endorsement is attached *are to remain in full force and effect as binding between the insured and the Company,* and the insured agrees to reimburse the Company for any payment made by the Company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the Company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement." (Emphasis added.)

**26.** Condition 11 of the INA policy reads as follows:

"Reimbursement
"It is agreed that such insurance as is afforded by the policy for Personal Injury [and] Property Damage . . . Liability *shall conform to the provisions of any state or federal motor carrier law which shall be applicable with respect to any such liability arising from the use of the automobile* during the policy period, to the extent of the coverage and limits of liability required by such law, but in no event in excess of the limits of liability stated in this policy. The Insured agrees to reimburse INA for any payment made by INA on account of any accident, claim or suit involving a breach of the terms of this policy and for any payment INA

incorporating the endorsement by reference, and the district court so construed the policy (86a–87a).[27]

The Supreme Court upheld these ICC "responsibility-and-control" regulations governing the operation of nonowned vehicles in *American Trucking Associations v. United States*, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953). There the Court discussed at length the background of abuses which the regulations were designed to remedy, including not only the sharing of limited operating authority under the guise of equipment leases but also the evasion of safety requirements and of financial responsibility for harm to the public. *Id.* at 303–11, 73 S.Ct. 307.[28] In *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.*, 423 U.S. 28, 96 S.Ct. 226, 46 L.Ed.2d 169 (1975), the Court reaffirmed this "basic responsibility of the lessee to the public," *id.* at 39, 96 S.Ct. at 234, and cited the elimination of "difficulties . . . of fixing financial responsibility for damage and injuries to . . . members of the public" as one of the "significant aims" of the federal rules, *id.* at 37, 96 S.Ct. at 234.

We may assume, without deciding, that if Refrigerated, as the holder of the ICC permit, were the only available defendant in this case, it could not escape these significant duties of care and financial accountability *to the public* which the federal rules, and the contractual undertakings pursuant thereto, impose upon lessees.[29] We may also assume, without deciding, that INA, as Refrigerated's certified liability insurer, could not absolve itself of a duty to make the initial payment of compensation to an injured member of the public, in the event that neither Refrigerated nor any other party involved could answer financially for the damage. The district court in this action may have intended to state nothing more than the above two propositions when it declared that "Refrigerated and INA . . . are in that order primarily responsible for defending the Babcocks' suit and for paying any damages the Babcocks might recover" (87a). We agree that these two principles are in accordance with the policy of this court. *See Mellon National Bank & Trust Co. v. Sophie Lines, Inc., supra* at note 29.

■■■ However, the pleadings in this declaratory action do not seek a determination of the duty owed by a motor-carrier lessee

would not have been obligated to make under the provisions of this policy except for the agreement contained herein." (21a–22a; emphasis added.)

27. The Tenth Circuit appears to have adopted a rule that even where the ICC endorsement is lacking, the court will read it into the policy, as if it were stamped thereon by operation of ICC regulations. *See Hagans v. Glens Falls Ins. Co. v. National Indem. Co.*, 465 F.2d 1249, 1252 (10th Cir. 1972). For reasons discussed above, we may assume that the language of the ICC endorsement is part of the INA policy, without adopting such a rule. See *Carolina Cas. Ins. Co. v. Underwriters Ins. Co.*, 569 F.2d 304, 312 (5th Cir. 1978).

28. The background of the regulations on vehicle leases is also discussed in *Simmons v. King*, 478 F.2d 857, 866–67 (5th Cir. 1973); *Agricultural Transportation Ass'n of Texas v. King*, 349 F.2d 873, 881–82 (5th Cir. 1965); *Mellon National Bank & Trust Co. v. Sophie Lines, Inc.*, 289 F.2d 473, 477 (3d Cir. 1961).

29. Thus, in *Mellon National Bank & Trust Co. v. Sophie Lines, Inc.*, 289 F.2d 473 (3d Cir. 1961), an action against a lessee by a person injured by the leased truck during the lease term, this court held that the lessee was responsible as a matter of law for the driver's negligence, even though the lessor had supplied the driver and even though the vehicle at the time of injury was engaged on the business of a third party without the lessee's knowledge.

In furtherance of the policy of protecting the public and providing it with an identifiable and financially accountable source of compensation for injuries caused by leased tractor-trailers, federal law in effect creates an irrebuttable presumption of an employment relationship between a driver and the lessee whose placards identify the vehicle. However, this statutory source of vicarious liability may represent only a minor extension of well-established common law principles. *See* Restatement (Second) of Torts § 428 (1965). Thus, in *Venuto v. Robinson*, 118 F.2d 679 (3d Cir.), *cert. denied*, 314 U.S. 627, 62 S.Ct. 58, 86 L.Ed. 504 (1941), this court found that the state law theory of vicarious liability for the negligence of an independent contractor was sufficient to subject a motor carrier to liability for a hired driver's negligence, even absent a federal statutory source for such liability.

and its insurer to the injured public. Rather, we view this case in its present posture as an action to determine where the ultimate financial responsibility for the injury rests, after the injured plaintiff has obtained a judgment against two parties held responsible in fact and in law. In this situation, the pertinent question is whether the federal policy of assuring compensation for loss to the public prevents courts from examining the manner in which private agreements or state laws would otherwise allocate the ultimate financial burden of the injury.

Carolina and Stanford appear to argue in this appeal that a court's analysis should stop with consideration of the ICC regulations and the public policies served thereby.[30] We disagree. While a lessee cannot free itself of its federally imposed duties when protection of the public is at stake, the federal requirements are not so radically intrusive as to absolve lessors or their insurers of otherwise existing obligations under applicable state tort law doctrines[31] or under contracts allocating financial risk among private parties. Thus, in a declaratory action similar to this one, determining which of two insurers owed primary coverage for liability arising from a leased vehicle's accident, this court rejected the reasoning of a district court which had relied solely upon the "responsibility-and-control" regulations to impose liability exclusively upon the lessee's insurer. *Allstate Insurance Co. v. Liberty Mutual Insurance Co.*, 368 F.2d 121 (3d Cir. 1976). That decision held that where the case is "concerned with responsibility as between insurance carriers," and not with the federal policy of protecting the public, "I.C.C. considerations are not determinative" and a court should consider the express terms of the parties' contracts. *Id.* at 125.[32]

---

**30.** They cite the following reasoning from an intermediate Maryland appellate court in support of their position:

"In our view the intent of Congress and the ICC was that the insurance company which wrote the ICC endorsement [i. e., the lessee's insurer] would be responsible for primary coverage, both as a matter of law and of public policy."

*Allstate Ins. Co. v. Federal Ins. Co.*, 23 Md.App. 105, 326 A.2d 29, *aff'd and modified*, 275 Md. 460, 341 A.2d 399 (1974).

**31.** We are not concerned here with the preemption of state regulations of motor carriers engaged in interstate commerce. *See e. g., Bailey v. Bruneau's Truck Service, Inc.*, 149 Conn. 46, 175 A.2d 372, 376 (1961). Whatever preemptive effect the ICC regulations may have in that limited field cannot form a basis for arguing that federal law also displaces state law doctrines governing master-servant relationships, *respondeat superior*, contribution among tortfeasors, or even ordinary negligence. *See, e. g., Simmons v. King*, 478 F.2d 857, 867 (5th Cir. 1973); *Continental Casualty Co. v. American Fidelity & Casualty Co.*, 275 F.2d 381, 383–84 (7th Cir. 1960); *Vance Trucking Co. v. Canal Insurance Co.*, 249 F.Supp. 33, 39 (D.S.C.1966), *aff'd* 395 F.2d 391 (4th Cir.), *cert. denied*, 393 U.S. 845, 89 S.Ct. 129, 21 L.Ed.2d 116 (1968). Indeed, so massive a disruption of the tissue of state law would be extraordinary in the American legal framework. See P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 470–71 (2d ed. 1973).

**32.** Accordingly, even though the tractor-trailer accident there occurred during the term of the lease, analysis of the insurance contracts led to the conclusion that the lessor's insurer expressly extended coverage to the loss and thus should bear financial responsibility for it. *Accord, Wellman v. Liberty Mutual Insurance Co.*, 496 F.2d 131, 139 (8th Cir. 1974) (ICC regulations may not be read into insurance contract to require lessee's insurer to pay judgment against lessor, whom the contract had expressly excluded from coverage); *see Consolidated Systems, Inc. v. Allstate Insurance Co.*, 411 F.2d 157 (5th Cir. 1969) (lessee's insurer not estopped by federal regulations to deny primary coverage as against lessor's insurer); *cf. Carolina Casualty Insurance Co. v. Pennsylvania Thresherman's & Farmers Mutual Casualty Insurance Co.*, 327 F.2d 324, 326 (3d Cir. 1964) (*state* motor carrier financial responsibility law not controlling in action between two insurers). The general principle upon which these cases rest—that a court may give effect to otherwise existing allocations of financial responsibility where the goal of protecting the injured public has already been fulfilled—appears to find affirmance in *Transamerican*. There the Supreme Court held that "[a]lthough one party is required by law to . . . bear the consequences of any negligence, the party responsible in law may seek indemnity from the party responsible in fact," pursuant to a hold-harmless agreement. 423 U.S. at 40, 96 S.Ct. at 235.

In the case before us, we find in particular that neither the federal motor carrier laws nor the (imputed) ICC endorsement nor paragraph 3 of Refrigerated's trip lease transfer to Refrigerated the duties to defend claims properly brought against others or to pay judgments entered against others. 49 U.S.C. § 315 [33] and 49 C.F.R. § 1043.-1(a),[34] governing insurance and other assurances of motor carriers' financial responsibility, require only that the carrier give security "to *pay* any final judgment recovered *against such motor carrier* . . .", they mention nothing about defense of actions and nothing about payment of judgments recovered against other parties such as lessors. The regulation governing qualification as a self-insurer, 49 C.F.R. § 1043.-5,[35] requires only that the self-insuring motor carrier establish its ability "to satisfy *its* obligations for bodily injury liability . .," not any other party's obligations. Nor does the ICC endorsement operate to relieve the lessor or its insurer of any ultimate financial responsibility for claims or judgments against them.[36]

Similarly, 49 U.S.C. § 304(e) [37] and 49 C.F.R. § 1057.4,[38] requiring "supervision and control" by lessees, are silent on the issues of defense and payment on behalf of other parties. The lease provision in which Re-

frigerated, as lessee, assumes such supervision and control likewise makes no mention of an undertaking to defend and pay actions against others. In particular, nowhere in the lease does the lessee assume the responsibility to insure the lessor, or to hold the lessor harmless against claims brought against it.[39]

In sum, since it is not sufficient to look solely to the federal motor carrier requirements or to the lease and insurance provisions pursuant thereto for a determination of the respective duties of insurer and a partially self-insured lessee, it is necessary to examine the allocation of legal obligations which state law imposes, and to examine the insurance contracts to see whether they effectively provide a different allocation of *financial* responsibility.

## 2. *The role of state law*

 While Delaware law in part governed the duties of care owed to the plaintiff by the alleged tortfeasors in Babcock's diversity suit, *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), at this stage of proceedings we are primarily concerned with the effect upon the parties to this appeal of the judgment entered "jointly and severally" against Re-

33. See note 22 above.

34. See note 23, 1st paragraph above.

35. See *id.,* 3rd paragraph.

36. See note 25 above. In the recent decision of *Carolina Cas. Ins. Co. v. Underwriters Ins. Co.,* 569 F.2d 304, 312 (5th Cir. 1978), the court stated the following about the ICC endorsement:

> "The purpose of § 215 of the Interstate Commerce Act and regulations is to assure to members of the public and shippers that a certificated carrier has independent financial responsibility, with the dollar limits prescribed, to pay for losses created by its carrier operations. On the face of the endorsement this is accomplished by reading out 'other insurance,' 'excess,' or similar clauses insofar as the amount available to a third party victim would be reduced. *But there is no need for or purpose to be served by this supposed automatic extinguishment of the clause insofar as it affects the insured or*

> *other insurers who clamor for part or all of the coverage."* (Emphasis added.)
> *Accord, Nat'l Mut. Ins. Co. v. Liberty Mut. Ins. Co.,* 90 U.S.App.D.C. 362, 196 F.2d 597, *cert. denied,* 344 U.S. 819, 73 S.Ct. 15, 97 L.Ed. 638 (1952).

37. See pages 134–135 above.

38. See note 19 above.

39. It is not uncommon for one party to a vehicle lease to undertake to obtain insurance coverage for the other. *See, e. g., Carolina Cas. Ins. Co. v. Underwriters Ins. Co.,* 569 F.2d at 307 n.5, for an example of such a clause. Refrigerated made no such undertaking in this case. On the contrary, it attempted to extract from Stanford an undertaking to indemnify Refrigerated for liabilities incurred by the latter, even for its own negligence. See note 13 above. (The jury found this purported "hold-harmless" agreement invalid in the *Babcock* case. See page 133 above.)

frigerated and Stanford.[40] As discussed above, under the circumstances of this case, we find nothing in the federal motor carrier laws that would displace any apportionment of legal obligations which Delaware law would otherwise impose upon joint tortfeasors. Specifically, these federal laws and regulations do not affect rights and duties of contribution.[41] Thus Delaware's Uniform Contribution Among Joint Tort-Feasors Law [42] would apply to the ultimate apportionment of the legal obligation to pay the judgment, as between Refrigerated and Stanford, provided that neither of these parties had relinquished its rights under that statute. However, rights of contribution under the Delaware statute, and insurers' rights of subrogation thereto, may be conditioned upon factual matters not on this record. *See, e. g.,* § 6302(b) and (c); 16 G. Couch, Cyclopedia of Insurance Law § 62:171 p. 577 n.20 (1966). Therefore, the district court on remand should make appropriate findings of fact and any determinations of state law necessary to ascertain how the state law of contribution allocates the legal obligations which arise from the accident.[43]

We hold only that we find nothing in the federal motor carrier requirements, and nothing in this record on appeal, that would defeat Refrigerated's rights of contribution against Stanford or its insurer.[44] Conversely, nothing in our present disposition should be construed to affect the latter parties' contribution rights against Refrigerated or its insurer.

**40.** Under elementary principles of common law and under the Delaware law governing Babcock's diversity case, joint tortfeasors held jointly and severally liable are each potentially accountable *to the plaintiff* for the entire judgment. *See Diamond State Tel. Co. v. University of Delaware*, 269 A.2d 52, 56 (Del.1970); *Lutz v. Boltz*, 9 Terry 197, 100 A.2d 647 (Del. Super.1953); *Leishman v. Brady*, 9 W.W.Harr. 559, 3 A.2d 118, 120–21 (Del.Super.1938); 86 C.J.S. Torts § 35, at 951 n.20 (1954) ("where independent acts of several tort-feasors, especially where such acts are negligent, combine to produce directly a single injury, each is responsible for the entire result"); 49 *id.*, Judgments § 36b, at 88 n.54; 48 *id.*, Joint at 798.

**41.** Such rights and duties are governed by the law of the forum in diversity cases. *Smith v. Whitmore*, 270 F.2d 741 (3d Cir. 1959); *Fehlhaber v. Indian Trails, Inc.*, 45 F.R.D. 285 (D.Del. 1968).

**42.** Del.Code tit. 10 §§ 6301–6308. Section 6302 provides:

"(a) The right of contribution exists among joint tort-feasors.

"(b) A joint tort-feasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof.

"(c) A joint tort-feasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tort-feasor whose liability to the injured person is not extinguished by the settlement.

"(d) *When there is such a disproportion of fault among joint tort-feasors as to render inequitable an equal distribution among them of the common liability by contribution, the relative degrees of fault of the joint tort-fea-*

*sors shall be considered in determining their pro rata shares.*" (Emphasis added.)

**43.** In light of the jury's finding, apportioning fault between Refrigerated and Stanford in the *Babcock* case, § 6302(d)—provided that it applies—would impose on Refrigerated an ultimate liability for 80%, or $27,200., of the $34,-000. *Babcock* judgment, while Stanford would have ultimate liability for 20%, or $7,800., of that judgment.

For another recent decision involving insurers of two joint tortfeasors under a state contribution statute, see *Johnson v. United States Fire Ins. Co.*, 586 F.2d 1291 (8th Cir. 1978).

**44.** The district court's declaratory judgment order declared that *both* Refrigerated and INA are "primarily responsible" for defense and payment in the underlying *Babcock* case. This language might have been construed, in the context of the pleadings in the declaratory action, to mean that Refrigerated was an insurer extending coverage to Stanford (the lessor) and Wicker (the driver), while Carolina's obligation under the terms of its policy was only that of an excess insurer. (An excess or secondary insurer "is not liable for any part of the loss or damage which is covered by other insurance. It is liable only for the amount of loss or damage in excess of the coverage provided by the other policy or policies of insurance." 16 Couch, *supra*, § 62:49.) If Stanford were deemed to be Refrigerated's insured, the latter's contribution rights might be affected, since in general an insurer cannot subrogate against its own insured. *Id.* § 61:133. Nor could Refrigerated recover from Carolina since a primary insurer cannot recover contribution from an excess insurer. *Id.* 62:48, 62:143.

### 3. *Terms of the insurance policies under applicable law*

The district court's mode of analysis in this declaratory action did not require close examination of the terms of the insurance contracts.[45] Nor, of course, was the district court able to analyze the effect upon these parties' obligations of a judgment entered jointly and severally against the lessor and lessee of the tractor-trailer, but not against the driver. Since we have concluded that in a case such as this one the federal motor carrier requirements do not displace rights and duties which the insurance contracts and state law would otherwise create, the next step in resolving this dispute would be an analysis of the terms of the contracts in light of the *Babcock* judgment and other events which have intervened since the entry of the declaratory judgment in this action.

This court is hampered in construing the terms of the insurance contracts by the lack of any indication in this record or in prior proceedings as to what state law should govern such construction.[46] Further, the circumstances of this case are somewhat unusual in that the jury found that the driver (Wicker) was not negligent, but that both lessee (Refrigerated) and lessor (Stanford) were independently negligent. The briefs on appeal do not address the subtler questions that arise in the construction of the policy terms in light of these jury findings. While neither Refrigerated nor Stanford claims to be an insured within the coverage of the other's insurance policy,[47] this court has received little guidance for construing the effect of the exclusion clause of the "Truckmen's Endorsement" in the Carolina policy,[48] especially as to the driv-

**45.** The district court indicated in its order denying reargument (114a–115a) that it looked solely to the federal motor carrier requirements for the source of the duties to pay and defend: "The primary responsibility to defend the Babcock action by Refrigerated is clearly spelled out in the Court's opinion as the duty imposed *by the ICC statute and regulations issued thereunder* referred to in the Opinion." (Emphasis added.)

**46.** Delaware conflict-of-law rules would govern the choice of state law applicable to the non-Delaware insurance contracts involved in this dispute. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 734, 85 L.Ed. 115 (1941). It is not clear from this record where those contracts were executed, *see* Restatement of Conflict of Laws §§ 311 *et seq.* (1934), or where the principal location of the insured risk was understood to be, *see* Restatement (Second) of Conflict of Laws § 193 (1971).

**47.** The INA policy's "omnibus" or "Definition of Insured" clause provides as follows (14a): "PERSONS OR ENTITIES INSURED "(a) The Named Insured; "(b) Each of the following is an Insured under this policy to the extent set forth below: The Insured, as referred to herein, shall include: all subsidiaries and affiliates and shall also include officers and directors of said companies, subsidiaries and affiliates, while acting within the scope of their duties as such officers and directors." In addition, various endorsements name specific parties as additional insureds (*e. g.*, 24a, 29a, 30a), but Stanford does not appear on any of these endorsements. Further, the (imputed) ICC endorsement says nothing about additional

insureds. *See Nat'l Mut. Ins. Co. v. Liberty Mut. Ins. Co.*, 90 U.S.App.D.C. 362, 196 F.2d 597, *cert. denied*, 344 U.S. 819, 73 S.Ct. 15, 97 L.Ed. 638 (1952).

Carolina's policy contains the following "omnibus" clause (58a): "Definition of Insured: "With respect to the insurance for bodily injury liability and for property damage liability the unqualified word 'insured' includes the named insured [Stanford] . . . and also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is . . . with the permission of [the named insured]. . . . ." That clause would include not only the driver (Wicker) but also Refrigerated, as lessee, were it not for the Truckmen's endorsement, *infra* at note 48.

**48.** The exclusion clause provides (61a): "Except with respect to the named insured or an employee thereof, but subject otherwise to the provisions of Insuring Agreement III, Definition of Insured, the insurance does not apply to any person or organization, or any agent or employee thereof, engaged in the business of transporting property by automobile for the named insured or for others (1) unless the accident occurs while such automobile is being used exclusively in the business of the named insured and over a route the named insured is authorized to serve by federal or public authority, or (2) if such person or organization so engaged is subject to the security requirements of any motor

er;[49] nor for determining the parties' duties of defense under the terms of the policies[50] and under governing state law.

carrier law and satisfies any such requirements by any means other than automobile liability insurance, or (3) if such person or organization so engaged is insured under an automobile liability insurance policy which affords coverage for automobiles hired by such person or organization but which does not insure on a direct primary basis the owners of such automobiles and the agents and employees of such owners, while such automobiles are being used exclusively in the business of such person or organization and over a route such person or organization *is* authorized to serve by federal or public authority;

"provided, however, a driver or other person furnished to the named insured with an automobile hired by the named insured shall not be deemed an employee of the named insured."

Although the vexatious language in this endorsement is difficult to comprehend, *see Transport Indem. Co. v. Home Indem. Co.*, 535 F.2d 232, 237–38 (3d Cir. 1976) ("subject to" clause); *compare Carolina Cas. Ins. Co. v. Underwriters Ins. Co.*, 569 F.2d at 308 n.8, *with Wellman v. Liberty Mut. Ins. Co.*, 496 F.2d 131, 137–39 (8th Cir. 1974), and *Pacific Intermountain Express Co. v. Liberty Mut. Ins. Co.*, 359 F.2d 735 (7th Cir. 1966) (effect of provisions (2) and (3) on coverage), in the fact situation here it appears to us that Carolina did not extend coverage to Refrigerated on a primary basis. *Transport Indem. Co. v. Home Indem. Co.*, *supra*.

**49.** The driver is deemed by law to be, in effect, an "employee" of Refrigerated, the lessee and holder of the ICC permit, as discussed above at note 29. *See, e. g., Simmons v. King*, 478 F.2d 857, 867 (5th Cir. 1973); *Mellon National Bank & Trust Co. v. Sophie Lines, Inc.*, 289 F.2d 473 (3d Cir. 1961). In this case it has not been found as a fact whether Wicker (the driver) also remained an "employee" of Stanford (the lessor and the named insured under the Carolina policy) within the contemplation of the "except" clause in the exclusion provision reproduced at note 48. *See, e. g., Carolina Cas. Ins. Co. v. Underwriters Ins. Co.*, 569 F.2d at 309; *Carolina Cas. Ins. Co. v. Pa. Thresherman's & Farmer's Mut. Cas. Ins. Co.*, 327 F.2d 324, 327 (3d Cir. 1964).

**50.** The INA policy provides (13a–14a):

"DEFENSE, SETTLEMENT AND SUPPLEMENTARY PAYMENTS

"This policy does not apply to defense, investigation, settlement or legal expenses arising out of any occurrence, but INA shall have the right and opportunity to associate with the Insured in the defense and control of any claim or proceeding arising out of such oc-

Complex questions relating to the "other insurance" clauses[51] in the policies also may arise: particularly with regard to other in-

currence reasonably likely to involve INA. In such event the Insured and INA shall cooperate fully.

"Should any occurrence appear likely to exceed the retained limit, no loss expenses or legal expenses shall be incurred on behalf of INA without its prior consent. Should any claim arising from such occurrence be adjusted prior to trial court judgment for a total amount not more than the retained limit, then no loss expenses or legal expenses shall be payable by INA. However, should the total amount for which such claim might be adjusted prior to such judgment exceed the retained limit, then, if INA consents to further trial court proceedings, it shall contribute to loss expenses and legal expenses in the ratio which its proportion of the liability for the judgment rendered, or settlement made, bears to the whole amount of paid judgment or settlement.

"*In the event that the limits of liability of underlying insurance are exhausted by an occurrence, INA shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the insured* resulting from the same occurrence, but only where this policy applies and is immediately in excess of such underlying insurance without intervening self-insurance or excess insurance with another insuror."

*(Emphasis added.)*

The Carolina defense clause provides in part (58a):

"Defense, Settlement, Supplementary Payments: With respect to such insurance as is afforded by this policy for bodily injury liability and for property damage liability, the company shall:

(a) *defend any suit against the insured* alleging such injury, sickness, disease or destruction and seeking damages on account thereof, *even if such suit is groundless, false or fraudulent*; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient . . . ."

(Emphasis added.)

**51.** The INA policy provides in part (20a–21a):

"Other Insurance not with INA

"If collectible insurance with any other insurer is available to the Insured covering a loss also covered hereunder, the insurance hereunder shall be in excess of, and not contribute with, such other insurance, provided, however, this does not apply to insurance which is written as excess insurance over the limit provided in this policy."

Carolina's policy provides in part (61a):

"Other Insurance. With respect to any automobile of the commercial type while leased

surance covering a different tortfeasor but the same joint liability,[52] to partial self-insurance,[53] and to other insurance policies with identical "other insurance" clauses.[54]

Under these circumstances, in this diversity case, this court will not indulge in the pre-*Erie* fallacy of looking to some "brooding omnipresence in the sky"[55] for a general law governing the interpretation of these insurance contracts. *See Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co.,* 276 U.S. 518, 532, 47 S.Ct. 472, 71 L.Ed. 842 (1928) (Holmes, J., dissenting). *See also Mutual Life Insurance Co. v. Johnson,* 293 U.S. 335, 339–40, 55 S.Ct. 86, 79 L.Ed. 646 (1934). Nor should we risk adding yet another inconsistent judicial interpretation of the terms of art on which insurers rely, *see Insurance Co. of North America v. Continental Casualty Co.,* 575 F.2d at 1072, by plunging into a detailed exegesis of these contracts with only schematic indications of the parties' own understanding thereof. Therefore, we think it appropriate that the district court on remand make the determinations of fact and law necessary to ascertain what law applies to the analysis of these contracts, and to construe, under applicable law, ambiguous or mutually exclusive provisions to the extent necessary to determine what duties of payment and defense the parties to this action undertook by contract.[56]

## IV. SUMMARY OF CONCLUSIONS

### A. *Contribution*

■ We conclude that nothing in the federal motor carrier requirements, the trip lease, or the imputed ICC endorsement to Refrigerated's insurance policy would alter any party's rights or duties of contribution. In particular, we make clear that those provisions do not impose on Refrigerated, as

or loaned to any person or organization, other than the named insured, engaged in the business of transporting property by automobile for others, or any hired private passenger automobile insured on the 'cost of hire' basis, or any non-owned automobile, the insurance shall be excess insurance over any other valid and collectible insurance."

52. The general rule appears to be that "other valid and collectible insurance" must be insurance which can be collected *by the person who is an insured* under the policy with the "other insurance" clause. *See, e. g., Consolidated Systems, Inc. v. Allstate Ins. Co.,* 411 F.2d 157, 159 (5th Cir. 1969); *Aetna Cas. & Sur. Co. v. Security Ins. Co. of Hartford,* 267 A.2d 582, 586 (Del.1970); 16 Couch, *supra* §§ 62:95, 62:96 and cases cited therein. Jurisdictions vary as to whether an overlap of *named* insureds is required to trigger the operation of the "other insurance" clause, *id.* § 62:95, or whether an overlap of *additional* insureds is sufficient, *id.* § 62:96.

53. The general rule appears to be that qualification as a "self-insurer," to satisfy motor vehicle security requirements, does not constitute "other valid insurance" sufficient to bring an "other insurance" clause into play. *See, e. g., Southeast Title & Ins. Co. v. Collins,* 226 So.2d 247, 248 (Fla.App.1969); *United National Ins. Co. v. Philadelphia Gas Works,* 221 Pa.Super. 161, 289 A.2d 179, 181 (1972); *cf. Universal Underwriters Ins. Co. v. Marriott Homes, Inc.,* 286 Ala. 231, 238 So.2d 730, 732 (1970) (workmen's compensation).

54. The general rule is that identical "excess insurance" clauses are considered to cancel each other out. *E. g.,* Note, *Concurrent Coverage in Automobile Liability Insurance,* 65 Col.L. Rev. 319, 324 (1965). However, courts in different jurisdictions vary in their subsequent apportionment of duties between insurers. *Compare Consolidated Systems, Inc.,* 411 F.2d at 162–63 (Florida law); 16 Couch, § 62:79 (insurers prorate according to limits of liability), *with State Farm Fire & Cas. Co. v. Holton,* 131 Ga.App. 247, 205 S.E.2d 872, 874 (1974); 16 Couch, § 62:80 (insurers share equally), *and with* 16 Couch, § 62:81 (owner's insurer primary). *See also* Risjord, *Other Insurance,* 29 Ins.Counsel J. 612 (1962).

55. *S. Pac. Co. v. Jensen,* 244 U.S. 205, 222, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting).

56. The district court's excursion through the terms of the insurance policies might find a useful guide in Judge Brown's thorough opinion in *Carolina Casualty Insurance Co. v. Underwriters Insurance Co.,* 569 F.2d 304 (5th Cir. 1978), a case which involved similar facts and a lessor's form policy substantially identical to that in the case before us. Although it involved Carolina, the plaintiff in the case before us, that decision, filed in March 1978, mysteriously eluded the attention of Carolina's counsel in this appeal until a date immediately before oral argument. Carolina's brief was filed in this court on July 7, 1978.

lessee, the status of an insurer with respect to Stanford, the lessor.[57] Since rights and duties of contribution may rest upon facts outside this record and upon issues of local law, we leave such determinations to the district court on remand.

### B. *Duty to pay*

We conclude that nothing in the federal motor carrier requirements, the trip lease, or the imputed ICC endorsement absolves Stanford and Carolina of any duty they might otherwise have to pay judgments entered against Stanford. Therefore, we will affirm the judgment of the district court insofar as it imposed a duty upon Refrigerated and INA to pay judgments entered against Refrigerated, but will remand for a determination whether the terms of the Carolina policy, in conjunction with the terms of the INA–Refrigerated contract, succeed in converting Carolina to a mere excess insurer.[58] If the district court should determine that Carolina is in fact a primary insurer as to Stanford's liability under the *Babcock* judgment, it will also have to determine how payment of that judgment shall be allocated among the parties to this action. In this event, if the Delaware contribution statute is operative, it appears likely that the eminently sensible outcome of this action would be that Carolina pay 20% of the $34,000. *Babcock* judgment for which its insured was found culpable, while INA and Refrigerated pay the 80% for which Refrigerated was found culpable.[59] However, the district court may determine that a different apportionment of payment is required by the contracts or by governing law in light of any factual determinations it makes and after ascertaining the positions of counsel.[60]

### C. *Duty to defend*

We conclude that nothing in the federal laws, the trip lease, or the imputed ICC endorsement alters otherwise existing duties to defend. Therefore, we leave for further determination on remand, or to agreement among the parties, the question of what duties the insurance contracts or governing state law imposed for defending claims against the driver, Wicker, and against the lessor, Stanford.

The judgment of the district court is vacated and the case is remanded for further proceedings in accordance with this opinion,[61] each party to bear its own costs in this court.

### ANNEX TO OPINION

### EXHIBIT A

### SPECIAL INTERROGATORIES TO THE JURY

I have prepared a set of questions that should assist you in rendering your verdict. The original or official copy of the questions will be handed to the Foreman who by tradition of this Court is Juror number 1. It is the original and official copy merely because it is the Foreman's copy. This copy should be signed by each of you after you have unanimously agreed upon the answer to each question which requires an answer. An extra copy of the questions will be handed to each juror and is merely for your convenience in considering your verdict.

I shall now read the first set of questions, adding a note of explanation wherever I think it will be useful to you. The questionnaire instructs you to "Answer the following questions in the order in which they are hereby presented." It is important to follow the order in which the questions are presented because some of the questions later on the questionnaire need not be answered if certain questions are answered in

---

**57.** See note 44 above.

**58.** See especially notes 51 and 52 above.

**59.** Both insurance policies measure the duty to pay by what "the insured shall become legally obligated to pay as damages" (13a, 58a).

**60.** We note that both insurers' pleadings in this action sought, as an alternative remedy, a prorating of payment according to the upper limits of the policies.

**61.** See particularly the last paragraph of part II and part IV of this opinion.

certain ways earlier in the questionnaire. So, although you should certainly read clear through the questionnaire before you start to answer any of the questions, I strongly urge that you take up the questions in the order in which they are presented. The questions are as follows:

1. Based upon the evidence and the instructions of law as given to you by the Court, do you find that plaintiff is entitled to damages from defendants or any of them?

Yes _x_ No ___

(If your answer is no, proceed no further. If your answer is yes, proceed to answer the following questions.)

2. How much damages do you award to plaintiff?

$34000

3. How do you allocate the fault as among defendant Wicker, the truck driver, defendant Stanford, the truck owner and lessor, and defendant Refrigerated Transport Inc., the lessee? In answering this question, you should not consider any claim for indemnification as between Stanford and Refrigerated Transport, Inc.

| | |
|---|---|
| Wicker | 0 % |
| Stanford | 20 % |
| Refrigerated Transport Inc. | 80 % |
| Total | 100 % |

You will now return to the jury room to begin your deliberations. When you reach agreement, you are to fill out and sign the question sheet. The questions will be read in open court when you return with your verdict and the Foreman will read your answers aloud. Depending upon your answers to these questions, you may be asked to answer additional questions.

EXHIBIT B

QUESTIONNAIRE

4. Has the plaintiff, Courtland T. Babcock, II, and/or the defendant, Refrigerated Transport Co., Inc., proven by a preponderance of the evidence that (a) the involved tractor-trailer had a defect in the braking system at the time the individual defendant, Charles Stanford, leased it to Refrigerated, and (b) the accident and plaintiff's claimed injuries were proximately caused by that defective condition?

Answer: No
(Yes or No)

5. Has the plaintiff, Courtland T. Babcock, II and/or Charles Stanford proven by a preponderance of the evidence that Refrigerated failed to perform its non-delegable duty to inspect the tractor-trailer as required by 40 CFR § 1057.4(c), or negligently performed that inspection, and that Refrigerated's failure or negligence was a proximate cause of the accident and the plaintiff's claimed injuries?

Answer: Yes
(Yes or No)

6. Has the plaintiff, Courtland T. Babcock, II, proven by a preponderance of the evidence that Refrigerated, Hugh Wicker, or Charles Stanford was independently negligent in violating a federal regulation (49 CFR § 393.48) by not having operative brakes on the tractor-trailer and that that failure or negligence was a proximate cause of the accident and plaintiff's claimed injuries?

| Answer: Refrigerated: | Yes |
|---|---|
| | (Yes or No) |
| Stanford: | No |
| | (Yes or No) |
| Wicker: | No |
| | (Yes or No) |

7. Has the plaintiff, Courtland T. Babcock, II, proven by a preponderance of the evidence that Refrigerated, Hugh Wicker or Charles Stanford was independently negligent in violating the federal regulations (49 CFR § 393.52) by reason of the fact that the tractor-trailer was not capable to being stopped in time to avoid the collision, and that that failure or negligence was a proximate cause of the accident and plaintiff's claimed injuries?

**146**

Answer: Refrigerated: _____Yes_____
 (Yes or No)

 Stanford: _____Yes_____
 (Yes or No)

 Wicker: _____No_____
 (Yes or No)

8. Has the plaintiff, Courtland T. Babcock, II, proven by a preponderance of the evidence that the individual defendant, Hugh F. Wicker, was guilty of negligence in failing to maintain proper control of the tractor-trailer or in driving carelessly and that such negligence proximately contributed to the cause of the accident and plaintiff's claimed injuries?

 Answer: _____No_____
 (Yes or No)

9. The Court has already ruled that Refrigerated is responsible for any negligence of Mr. Wicker. If your answer to Question 8 is "yes," do you find that Mr. Wicker was also acting as the servant or employee of Charles Stanford at the time of the accident?

 Answer: _Not Applicable_
 (Yes or No)

10. Do you find that there was a valid hold harmless agreement such that Refrigerated is entitled to indemnity or reimbursement from Stanford:

 Answer: _____No_____
 (Yes or No)